IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICKY STEVEN LEWIS, | ) | CASE NO. 5:17-CV-2438 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Ricky Steven Lewis ("Lewis") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Lewis filed his application for DIB in October 2014, alleging a disability onset date of April 5, 2014. Tr. 178. He alleged disability based on the following: prostate cancer, stage 1; type 2 diabetes; osteoarthritis; hyperthyroidism; hypertension; lymphadenopathy; and back pain. Tr. 241. After denials by the state agency initially (Tr. 88) and on reconsideration (Tr. 102), Lewis requested an administrative hearing (Tr. 120). A hearing was held before Administrative Law Judge ("ALJ") Susan Smoot on August 16, 2016. Tr. 28-74. In her September 8, 2016, decision (Tr. 13-22), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Lewis can perform, i.e. he is not disabled. Tr. 21. Lewis requested

1

review of the ALJ's decision by the Appeals Council (Tr. 177) and, on September 18, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Lewis was born in 1953 and was 61 years old on the date his application was filed. Tr. 178. He graduated from high school and has about a year of college studying accounting and computer programming. Tr. 35. He served in the Air Force for seven years, where he was trained as a law enforcement specialist and an air traffic controller. Tr. 36. He more recently worked as a taxi dispatcher, delivery driver, and Uber driver. Tr. 37-44.

### B. Relevant Medical Evidence[1]

On November 26, 2013, Lewis saw Emile Mehanna, M.D., for an endocrinology consultation after he had been found to have a thyroid nodule on his neck. Tr. 644-647. Lewis denied palpitations, increased sweating or cold intolerance. Tr. 645. He stated that he "has some work related anxiety/paranoia which is not affecting his functionality" and that he was aware of available resources at the Veterans Affairs ("VA") system and would seek help if he needed it. Tr. 645. He reported weight gain which he attributed to the fact that he had stopped smoking in 2012 and had been eating more. Tr. 645. Further work-ups were planned. Tr. 647.

On December 17, 2013, thyroid imaging with uptake demonstrated borderline high 24-hour thyroid uptake with intense increased radiotracer focus in the right lobe with suppression of radiotracer activity in the rest of the right lobe and entire left lobe, which likely represented

---

[1] Lewis only challenges the ALJ's finding regarding his mental impairments and his hypothyroidism. Accordingly, only the medical evidence relating to those impairments are summarized and discussed herein.

hyperthyroidism secondary to a toxic nodule. Tr. 566-567. Iodine-131 therapy was recommended. Tr. 567.

On January 27, 2014, radiologist Ronnie Derrwaldt orally administered Iodine 131 therapy, a radiopharmaceutical, for hyperthyroidism. Tr. 557-558.

On February 10, 2014, Lewis saw Mandeep Saran, N.P., for follow-up for his chronic health conditions (prostate cancer, benign thyroid nodule status post I-131 therapy, diabetes, hypertension). Tr. 807-814. He reported "doing generally well." Tr. 810. Upon exam, Lewis' thyroid was smooth. Tr. 812. He reported forgetfulness but scored a 29/30 on a mini-mental status examination; Saran described his forgetfulness as "stable." Tr. 813. Lewis denied fatigue and mood changes. Tr. 811.

On May 25, Lewis sought care for left sided low-back pain. Tr. 341. He denied depression and anxiety and had a normal affect. Tr. 341-342.

On June 16, 2014, Lewis returned to Mandeep Saran for a follow-up visit and complained of left flank pain. Tr. 726-733. He denied fatigue and mood changes. Tr. 731. Upon exam, his thyroid was smooth. Tr. 731. A laboratory panel showed that Lewis now had hypothyroidism, and Saran prescribed levothyroxine. Tr. 732. Lewis again scored 29/30 on a mini-mental status examination and Saran commented, "no worsening at this time." Tr. 730.

Over the next few months, Lewis continued taking levothyroxine and underwent laboratory panels to monitor medication efficacy and compliance. Tr. 734-736.

On August 7, 2014, Lewis saw oncologist Adir Luden, M.D. Tr. 508. He stated that he had been feeling well. Tr. 508. Dr. Luden commented that Lewis was clinically and biochemically stable and that he had recovered nicely from the acute side effects of radiotherapy

for prostate cancer, which, in his case, were minimal. Tr. 508. Dr. Luden released him from care. Tr. 508.

On October 27, 2014, Lewis saw Mandeep Saran for a follow-up on his chronic medical conditions and ongoing back pain. Tr. 487-493. Lewis complained of weight gain and fatigue, but Saran noted that Lewis had not been compliant with follow-up orders. Tr. 490. He denied mood changes. Tr. 491. Upon exam, his thyroid was smooth. Tr. 491. He had an elevated TSH level; Saran noted that he had recently had his levothyroxine dosage increased and referred him to endocrinology. Tr. 493. Lewis reported forgetfulness, but scored 29/30 on a mini-mental status examination. Tr. 493.

On December 8, 2014, Lewis saw nurse practitioner Augusta Boyd in endocrinology for a follow-up appointment for management of his hypothyroidism. Tr. 482-484. Lewis reported fatigue. Tr. 482. His weight was stable. Tr. 482. He was advised to undergo another ultrasound and to return in one year unless he experienced a change in the size of thyroid nodules. Tr. 484. On March 5, 2015, endocrinology advised that Lewis continue his medication at its current dosage and seek a thyroid ultrasound in one year. Tr. 1160.

On April 15, 2015, an ultrasound showed a dominant nodule in the lower pole of the right upper lobe of Lewis' thyroid gland. Tr. 1955-1956.

On May 11, Lewis saw Mandeep Saran for follow-up for his chronic health conditions. Tr. 465-470. He reported forgetfulness and fatigue and denied unintended weight gain or mood changes. Tr. 468, 469. A biopsy of his thyroid gland was benign. Tr. 468. Upon exam, his thyroid was smooth and Saran kept his levothyroxine at the same dosage level. Tr. 469. Saran cited a 29/30 score on a mini-mental-status examination and stated that Lewis' forgetfulness was stable. Tr. 469.

On July 22, 2015, Lewis returned to Saran and reported feeling fatigued/tired and having low energy levels due to hypothyroidism, for which he took levothyroxine every morning. Tr. 457, 459, 460. Saran increased his levothyroxine dosage. Tr. 461.

On September 3, Lewis saw Saran for follow-up. Tr. 454. He reported that he was taking his levothyroxine every morning and had less fatigue. Tr. 454. He complained that his memory and concentration were getting worse and he was experiencing a lot of stress. Tr. 454. Upon exam, he had a normal affect. Tr. 455. Saran wrote that "memory loss/low attention span" was most likely secondary due to stress. Tr. 456. He offered a mental health evaluation but Lewis "refused." Tr. 456. Saran ordered a laboratory panel. Tr. 456.

On February 17, 2016, Lewis saw Saran for follow-up and reported no change in his energy level: it was low and he felt tired. Tr. 1873, 1874. He again reported stress and memory issues and Saran again suggested his memory issues were related to stress. Tr. 1877. Saran offered a mental-health referral "but he refuses seeing someone outside." Tr. 1877.

On March 15, 2016, an ultrasound of Lewis' right-side thyroid nodule showed no adenopathy and decreased size. Tr. 1847-1848. He was advised to seek a repeat ultrasound in one year. Tr. 1908.

**C. Medical Opinion Evidence**

    **1. VA examiners**

On April 7, 2014, a compensation and pension examination was performed by VA physician assistant John Birdsell. Tr. 768-774. Birdsell reviewed Lewis' medical records associated with his diagnosis of prostate cancer and conducted a telephonic interview with him. Tr. 769-770. Birdsell's exam notes listed an active diagnosis of prostate cancer that was service connected; that Lewis was currently undergoing radiation treatment; he experienced some

5

fatigue with treatments; and he had a past medical history that included depression (2007) and PTSD (1999). Tr. 770-771, 774.

On November 30, 2015, Lewis saw VA psychologist Priscilla Kingston, Ph.D., for an evaluation of his mental disorders. Tr. 1911-1915. Dr. Kingston noted that Lewis currently had generalized anxiety disorder characterized by "vague [symptoms] of anxiety while driving (fear of getting lost, having an accident) and of the future as he no longer works (finances)." Tr. 1911. He also complained of forgetfulness "generally" but Dr. Kingston noted that a recent mini-mental-status examination showed a score of 30/30, i.e., "no evidence of this." Tr. 1911-1912. Upon exam, Lewis was slightly anxious and had a constricted affect. Tr. 1914. Dr. Kingston wrote that she was the examiner on his previous review, in 2012, and that at that time she had assessed his symptoms as mild and that he no longer met the criteria for PTSD. Tr. 1914. She was therefore "unsure" why he had been raised from a 50% to 70% service connected disability for generalized anxiety disorder because his symptoms at the current visit "appear to be even better than in 2012." Tr. 1914. She explained that in 2012 his PTSD had been exacerbated by his mother's death in 2011 and that he no longer had this stress. Tr. 1014. He had not been seen in the mental health department since May 2012 and he no longer took psychiatric medications. Tr. 1914-1915. He is able to work part time and he stated that he no longer feels depressed. Tr. 1914-1915. Dr. Kingston also commented that, in 2012, Lewis reported flashbacks 2-3 times a week, which he did not report at his current visit. Tr. 1915. She recommended decreasing his rating to 50%. Tr. 1915. She assessed Lewis' symptoms as mild or transient and stated that there was no indication that his symptoms were severe enough to prevent him from working. Tr. 1912, 1915.

    **2. Consultative Examiner**

On January 7, 2015, Lewis saw clinical neuropsychologist Joshua Magleby, Ph.D., for a consultative examination.  Tr. 541-548.  Lewis reported physical problems as the reason he was unable to work (arthritis, prostate cancer treatment) and that he felt like his memory was not as good as it had been.  Tr. 543.  He reported a past history of PTSD and generalized anxiety in the 1990s, but neither was active at this time.  Tr. 543.  He was not in treatment and he was able to handle his flashbacks mostly on his own, learning to "look through" them.  Tr. 543.  He stated that he avoids crowds, although he can be around people at church because it is a low-stress environment.  Tr. 543.  When driving down the street he would occasionally forget where he was going and he had recurrent and intrusive thoughts.  Tr. 543.  He described his mood as "easy going" and "jovial" most of the time, although he would sometimes "blow my stack" when driving a car.  Tr. 543.  He denied depression and becoming violent.  Tr. 543, 545.  He reported no limitations in his activities of daily living.  Tr. 544.  Upon exam, he was generally appropriate and composed for the situation, he had linear thoughts, normal speech, and a good ability to understand simple verbal and complex directions.  Tr. 545.  His affect was normal and he had a stable mood and normal psychomotor activity.  Tr. 545.  He showed no signs of anxiety and reported no PTSD impairments.  Tr. 545.  He had a fair memory (auditory recall 1/3), fair insight and judgment, average processing speed, and average intelligence.  Tr. 546.  Dr. Magleby diagnosed unspecified trauma and stressor-related disorder and unspecified neurocognitive disorder.  Tr. 546.  He opined that Lewis had an average ability to perform work-related mental tasks, and he was somewhat impaired in his ability to withstand mental stress and pressures associated with day to day work activities, "comprised by PTSD and short-term recall problems."  Tr. 547.

### 3. State Agency Reviewers

On December 2, 2014, state agency reviewing physician Leon D. Hughes, M.D., reviewed Lewis' record and opined that his hypothyroidism was being treated and was under control. Tr. 85. On March 10, 2015, state agency reviewing physician Paul Morton, M.D., reviewed Lewis' record and agreed with Dr. Hughes' opinion. Tr. 99.

On January 21, 2015, state agency reviewing psychologist Cynthia Waggoner, Psy.D, reviewed Lewis' record and rated the severity of his mental impairments. Tr. 80-82. Dr. Waggoner listed a medically determinable severe impairment of an anxiety disorder (Tr. 81), commented that he had a history of PTSD and depression, but found that his affective conditions did not appear to be currently medically determinable impairments. Tr. 82. She explained that Lewis did not have any current psychological treatment and mental-status examinations, including memory functioning, were normal, and his activities of daily living were not significantly limited. Tr. 82. She concluded that Lewis' mental conditions were non-severe. Tr. 82. On March 16, 2015, state agency reviewing psychologist Carl Tishler, Ph.D., reviewed Lewis' record and adopted Dr. Waggoner's opinion. Tr. 95-96.

**D. Testimonial Evidence**

**1. Lewis' Testimony**

Lewis was represented by counsel and testified at the administrative hearing. Tr. 30. He is single and lives in a condominium. Tr. 33. His adult son was temporarily living with him. Tr. 33-34. He has a 90% disability rating from the VA based on PTSD and diabetes and receives compensation. Tr. 34. He has a driver's license and recently was a driver for Uber. Tr. 34-35. He is limited in his ability to drive because of his attention span; sometimes he takes a wrong turn or forgets where he is going. Tr. 35. He was almost in an accident a couple of times and he is driving under a lot of stress. Tr. 35. He started driving for Uber in June 2015 and averaged

two or three hours a day.  Tr. 38.  Most of his Uber driving was local and he stopped performing this work in March 2016.  Tr. 38.  He stopped working because of the toll on his back, the stress, he got a complaint about almost being in an accident, and not putting in enough hours.  Tr. 38.

Prior to driving for Uber, Lewis worked as a supervisor dispatcher for a taxi service.  Tr. 39, 57-58.  He was working full time performing that job in 2013 and stopped when he was diagnosed with prostate cancer and had to go to a lot of appointments.  Tr. 41.  He had treatments every day for 45 days.  Tr. 41-42.  He would get off work at 6:30 a.m. and had to be in Cleveland by 9:00 a.m. for treatments and it was taking its toll; he was sleeping past the time and he was fatigued from the radiation.  Tr. 41.  He did not return to that job after his treatments because he had been replaced and it was no longer available.  Tr. 42.  He also worked as a taxi dispatcher in 2003 in Florida but he had to stop doing that work because there was a lot of stress and he started experiencing more PTSD symptoms.  Tr. 43-44.

When asked what prevents him from working, Lewis stated that he has been having a lot of medical appointments and added stress since his prostate cancer has returned.  Tr. 47.  His thyroid problem causes low energy and a bad attention span.  Tr. 47.  He also has pain in his back and hips.  Tr. 47.  The ALJ confirmed that Lewis had 45 days of radiation treatment beginning in 2014 and it was thought to have been in remission and Lewis agreed.  Tr. 47-48.  Lewis explained that he was no longer receiving treatment after that 45-day period but they were monitoring his PSA levels.  Tr. 48.  Doctors had offered him hormone and surgery to treat his prostate cancer but Lewis elected not to undergo those treatments and to have radiation treatments instead.  Tr. 48.  He had side effects from the radiation, mostly fatigue.  Tr. 48.  He started to feel somewhat better after his radiation treatments ended, but with his thyroid issue he still had fatigue, although it was not as profound as before.  Tr. 49.  Meanwhile, in June 2016 his

9

doctors had discovered that his cancer had come out of remission. Tr. 49. They recommended treatment but it would not have been very successful, so Lewis elected to wait until some better treatment came along. Tr. 49. Currently, it is in the early stages and he is still going to be treated for it; he would be discussing treatment with his doctor soon. Tr. 49.

The ALJ asked Lewis about his thyroid problem. Tr. 49. Lewis explained that this came about a few years ago when he was coming out of his cancer treatment. Tr. 50. He was diagnosed with a nodule on his thyroid; the doctors destroyed the nodule, but this made it difficult on his thyroid. Tr. 50. This causes fatigue, weight gain, and feeling like he is out of breath sometimes when he walks up stairs. Tr. 50. He is taking medication, which helps somewhat, but he still has fatigue. Tr. 50.

Lewis described his mental problems: sometimes he has a short attention span and memory. Tr. 50-51. He still has some stress and his prostate cancer returning has caused more stress as has dealing with a lot of appointments. Tr. 51. His attention problems started about a year prior to the hearing when he started going back to work after experiencing more stress after his mother died and dealing with her estate and he could not remember a lot of things sometimes. Tr. 51. He is also being treated for anxiety but he is not on any medication. Tr. 51. He had been on medication a "long time ago"—several years. Tr. 52. He stopped taking medication because he had "bad reactions." Tr. 52. He has gotten counseling for mental health issues for about three years, but not through the VA. Tr. 52. He finds the counseling helpful. Tr. 52. He also has PTSD and has flashbacks from the war. Tr. 61. Going to church helps. Tr. 61. He sometimes has flashbacks daily but he has learned to look through them. Tr. 61. He sometimes has problems being around crowds of people. Tr. 62. When he goes to church he tries to sit "a little bit away." Tr. 62. He sometimes has problems sleeping; on a typical night he gets about 5 or 6

hours and sometimes gets 8 if he doesn't have anything to do. Tr. 62. He has to wake up a lot to urinate because of his prostate cancer. Tr. 62. He sometimes remembers to take his medication on his own, although he may forget to see his medication divider box. Tr. 64. His son checks to make sure he took his medication. Tr. 64. Lewis also has to make a list before he goes to the grocery store and has in the past forgotten to send in a payment when managing his banking. Tr. 64-65. On a day when his stress, PTSD, and anxieties are worse, he usually tries to leave the house and go somewhere, such as visiting his grandchildren. Tr. 65-66. He has bad days about three times a week since his son has gotten sick, and, before his son got sick, about once a week. Tr. 66.

Lewis described a typical day: he wakes up and reads and studies the bible. Tr. 53. He follows a home study course through his church. Tr. 53. It takes him awhile because his attention span isn't that great. Tr. 56. He usually will have his breakfast and try to do something around the house that needs to be done, like minor chores such as washing clothes, loading the dishwasher, and wiping off the counter. Tr. 53. He does not have to take care of the grounds around his condo, just the inside and his patio. Tr. 54. His son also helps him with things. Tr. 54. Bending over his hard for him; for example, he tried to sweep his patio the other day but only lasted about a half an hour before having to come back inside. Tr. 55. It is not a big patio but there are a lot of weeds that grow up around it and he was bending over and pulling them out and this hurt his back. Tr. 55. He also has a hard time getting up after bending down low doing something like changing the cat litter. Tr. 55. Once in a while he will go to church on Sundays, if he feels like it. Tr. 56. He is able to buy groceries, pay bills, and go to his grandchildren's sporting events. Tr. 57.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Mark Pinti testified at the hearing. Tr. 67-73. The ALJ discussed with the VE Lewis' past relevant work. Tr. 68. The ALJ asked the VE to determine whether a hypothetical individual with Lewis' age, education and work experience could perform his past relevant work or any other work if the individual had the following characteristics: can perform light work; can frequently climb stairs but never ladders, ropes or scaffolds; can frequently stoop, kneel, crouch and crawl; and must avoid exposure to moving mechanical parts and unprotected heights and commercial driving. Tr. 69. The VE answered that such an individual could perform Lewis' past work as a dispatcher and could also perform work as a housekeeper cleaner (50,000 national jobs); laundry or garment folder (50,000 national jobs); and ticket seller (100,000 national jobs). Tr. 69-71. The ALJ asked the VE if such an individual could still perform Lewis' past work if the individual was limited to sedentary work and the VE answered that such an individual could. Tr. 71-72. The ALJ asked the VE how much time an individual could be off-task or absent and still remain competitively employable and the VE answered no more than 15% (or more than one hour in an 8-hour workday) of off-task time and no more than one day of absences per month. Tr. 72.

Lewis' attorney asked the VE whether his answer to the ALJ's first two hypotheticals would change if the individual was limited to simple, routine, repetitive tasks, few changes in a routine setting, and no fast-paced production requirements. Tr. 73. The VE stated that such a change would rule out all past relevant work. Tr. 73.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

13

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her September 8, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2017. Tr. 15.

2. The claimant has not engaged in substantial gainful activity since April 5, 2014, the alleged onset date. Tr. 15.

3. The claimant has the following severe impairments: osteoarthritis, prostate cancer status post-radiation therapy–recurrent, and lumbar degenerative disc disease. Tr. 15.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 17.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can frequently climb ramps or stairs. He can never climb ladders, ropes, or scaffolds. The claimant can frequently stoop, kneel, crouch, and crawl. He must avoid exposure to moving mechanical parts, unprotected heights, and commercial driving. Tr. 18.

6. The claimant is capable of performing past relevant work as a taxi dispatcher. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 21.

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 5, 2014, through the date of this decision. Tr. 21.

### V. Plaintiff's Arguments

Lewis argues that the ALJ erred at step two when she did not find his mental health impairments and hypothyroidism to be severe impairments and erred at step four because she

---

C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

relied on an inaccurate hypothetical in determining that Lewis could perform his past work. Doc. 18, pp. 1, 15-22.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err at step two

At step two, a claimant must show that he suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience). *Long v. Apfel*, 1 Fed. App'x 326, 331-332 (6th Cir. 2001); 20 C.F.R § 404.1521(c). Basic work activities are defined by the regulations as "'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to

supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. App'x 181, 190 (6th Cir. 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

In *Higgs v. Bowen*, the Sixth Circuit found that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." 880 F.2d 860, 862 (6th Cir. 1988). The *Higgs* court observed that "this lenient interpretation of the severity requirement in part represents the courts' response to the Secretary's questionable practice in the early 1980s of using the step two regulation to deny meritorious claims without proper vocational analysis." *Id*. But the court also recognized that "Congress has approved the threshold dismissal of claims obviously lacking medical merit . . . ." *Id*. That is, "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 863. The *Higgs* court approved of that practice and affirmed dismissal because the record contained no objective medical evidence to support the plaintiff's claims of severe impairment. Particularly relevant to the case at bar, the *Higgs* court observed, "[t]he mere diagnosis of [an ailment], of course, says nothing about the severity of the condition." *Id*.

Since *Higgs*, the Sixth Circuit has regularly found substantial evidence to support a finding of no severe impairment if the medical evidence contains no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition. *See, e.g., Long*, 1 Fed. App'x at 332; *compare Maloney v. Apfel*, 211 F.3d 1269 (table), 2000 WL 420700 at *2, (6th Cir. 2000) (per curiam) (finding substantial evidence to support denial when record indicated claimant showed symptoms and was diagnosed with disorder but did not contain evidence of a disabling impairment that would prevent work); and *Foster v. Sec'y*

*of Health & Human Servs*., 899 F.2d 1221 (table), 1990 WL 41835 at *2 (6th Cir. 1990) (per curiam) (finding substantial evidence to support denial when the claimant produced no evidence regarding the frequency, intensity, and duration of arthritic pain; the record indicated that he was no more than slightly or minimally impaired); *with Burton v. Apfel*, 208 F.3d 212 (table), 2000 WL 125853 at *3 (6th Cir. 2000) (reversing finding of no severe impairment because record contained diagnoses and remarks from a number of treating physicians and psychologists to the effect that claimant was "'unable to work ... due to the complexity of her health problems'" (quoting physician)); *and Childrey v. Chater*, 91 F.3d143 (table), 1996 WL 420265 at *2 (6th Cir. 1996) (per curiam) (reversing finding of no severe impairment because record contained an assessment by a consulting physician reflecting a variety of mental problems that left her "'not yet able to really care for herself alone,'" reports of two other physicians corroborating this, consistent testimony from the claimant, and no medical evidence to the contrary (quoting physician)).

Regarding his mental impairments, Lewis states that has been diagnosed with PTSD, depression, generalized anxiety disorder, and an unspecified neurocognitive disorder. Doc. 18, p. 17. He asserts that he has complained of issues related to these impairments "[o]ver the years" and that Dr. Magleby, the consultative examiner, opined that Lewis' memory was somewhat impaired as was his ability to withstand the pressures associated with day-to-day work activity. Doc. 18, p. 17.

The ALJ explained that Lewis' mental impairments, considered singly and in combination, do not cause more than minimal limitations in Lewis' ability to perform basic mental work activities and are, therefore, not severe. Tr. 16. The ALJ found that Lewis had mild limitations in the three functional areas (activities of daily living, social functioning,

17

concentration, persistence or pace) and no episodes of decompensation. Tr. 16. She gave great weight to the state agency reviewers' opinion that he has no more than mild limitations, commenting that Lewis displayed largely modest mental symptoms and had logical thoughts and cooperative behavior at exams. Tr. 16. She discussed Dr. Magleby's exam and opinion and observed that Dr. Magleby did not describe the degree to which he found Lewis to be impaired, commenting that Dr. Magleby's exam findings were generally unremarkable and that Lewis had few ongoing substantial symptoms, suggestive of only mild limitations. Tr. 16-17. The ALJ gave great weight to Dr. Kingston's opinion that Lewis had no significant mental symptoms that prevented him from working. Tr. 17.

Lewis does not identify treatment notes during the relevant period indicating that he had regularly complained of and was assessed with any ongoing mental impairments other than forgetfulness. Although the ALJ did not find Lewis to have any severe mental impairments at step two, the ALJ considered Lewis' mental impairments when assessing Lewis' RFC:

> As for the claimant's mental limitations, he asserted that he had ongoing depression and anxiety, with poor memory and attention. However, the treatment notes show only occasional mental health complaints with little ongoing treatment. Moreover, he exhibited largely normal mental functioning at exams.

Tr. 21. Elsewhere in her decision, the ALJ remarked that Lewis had complained of forgetfulness to Mandeep Saran (whom he saw regularly) and observed that Lewis did not have mental status abnormalities upon exam. Tr. 19. She commented that, when Lewis later complained to Saran that his forgetfulness was worsening, Lewis, twice, refused an evaluation offered by Saran. Tr. 19. In sum, the ALJ considered Lewis' mental impairments and found them to be not severe. Moreover, the ALJ expressly considered Lewis' mental impairments when assessing his RFC, so the ALJ's failure to classify Lewis' mental impairment as "severe" at step two is not reversible error. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the

18

failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Fisk v. Astrue*, 253 Fed. App'x 580, 583-584 (6th Cir. 2007) ("When an ALJ determines that one or more impairments is severe, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe ... an ALJ's failure to find additional severe impairments at step two does not constitute reversible error," quoting Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *5; *Maziarz*, 837 F.2d at 244); *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009); *Kirkland v. Comm'r of Soc. Sec.*, 528 Fed. App'x 425, 427 (6th Cir. 2013).

Lewis concedes that the failure of an ALJ to find an impairment severe at step two is not reversible error when the ALJ considers all impairments in the remaining steps. Doc. 20, p. 4. He argues that case law requires an ALJ "to take the additional impairments into consideration when formulating a claimant's RFC" and that the ALJ in his case did not. Doc. 20, p. 4. As proof that the ALJ did not consider Lewis' non-severe impairments, Lewis points out that the ALJ did not include mental health limitations in her RFC assessment. Id. But the case law does not require an ALJ to include limitations for non-severe impairments; the case law requires the ALJ to *consider* the claimant's non-severe impairments. *See, e.g., Nejat*, 359 Fed. App'x at 577 (citing *Maziarz*, 837 F.2d at 244). Here, the ALJ considered Lewis' non-severe impairments in formulating her RFC assessment.

The ALJ found Lewis' hypothyroidism to be non-severe at step two and considered his hypothyroidism and fatigue when explaining her RFC assessment. Tr. 15, 19. Notably, no physician assessed any limitations due to hypothyroidism or fatigue. Moreover, Lewis does not identify how his fatigue limited him and what further limitation he believes should have been

included in his RFC. The ALJ found that Lewis was more restricted than one of the state agency reviewing physician's opinions (limiting him to medium work) and assessed an RFC limiting him to light work. Tr. 20. In sum, the ALJ did not commit reversible error, and her decision is affirmed. *Maziarz*, 837 F.2d at 244.

### B. The ALJ did not err at step four

Lewis argues that the ALJ erred at step four because she did not properly evaluate the cumulative effects of Lewis' impairments. Doc. 18, p. 21. He argues that, had the ALJ adopted the limitations that Lewis' attorney posited in a hypothetical to the VE, the ALJ would have been required to find Lewis disabled. Doc. 18, p. 22. But the ALJ did not adopt the limitations that Lewis' attorney posited to the ALJ at the hearing. Moreover, as described above, the ALJ considered the cumulative effects of Lewis' impairments, severe and non-severe. She accurately stated that Lewis' treatment notes showed only occasional mental health complaints, he had largely normal mental functioning up examinations, and he had little ongoing treatment. Tr. 21. Because substantial evidence supports the ALJ's decision, the decision is affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED.

Dated: September 26, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge